NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JASON MOSTAFA ALI,** | |
| *Plaintiff*, | **Civil Action No. 17-2210** |
| v. | |
| **WOODBRIDGE TOWNSHIP SCHOOL DISTRICT, et al.,** | **OPINION** |
| *Defendants.* | |

ARLEO, UNITED STATES DISTRICT JUDGE

**THIS MATTER** comes before the Court by way of a Motion for Summary Judgment filed by Defendants Woodbridge Township Board of Education, Woodbridge Township School District (collectively, "Woodbridge" or the "District"), Superintendent Robert Zega ("Zega"), and Principal Glenn Lottman ("Lottman" or when referenced collectively with Woodbridge and Zega, "Defendants"), against Plaintiff Jason Mostafa Ali ("Ali" or "Plaintiff"). ECF No. 25. Plaintiff opposes the Motion. ECF No. 28. For the reasons set forth below, the Motion is **GRANTED IN PART** and **DENIED IN PART**. The sole surviving claim is remanded to the New Jersey Superior Court for lack of subject-matter jurisdiction.

## I.    BACKGROUND

This employment dispute raises the question of whether a teacher can be terminated for allowing access to repugnant, anti-Semitic, and inflammatory media as part of a high school history lesson on the terrorist attacks that occurred on September 11, 2001. Plaintiff alleges that Defendants unlawfully terminated his employment because of his race and religion. Plaintiff further alleges that Defendants failed to provide him with sufficient notice of his rights in

1

connection with his termination under the Open Public Meetings Act and the Consolidated Omnibus Budget Reconciliation Act.

Plaintiff also alleges that Defendants made defamatory statements in violation of the common law and Plaintiff's due process rights, and asserts claims for violation of his First Amendment rights to Freedom of Speech and Academic Freedom.

## A. Facts

### 1. Plaintiff's Employment at Woodbridge

Plaintiff was employed as a non-tenured history teacher at Woodbridge High School from September 2015 to September 2016. Defendants' Local Rule 56.1 Statement of Material Facts ("SOMF")[1] at ¶¶ 2, 6, 58, 69. Plaintiff is of Egyptian descent. Id. ¶ 7. He identifies as a non-practicing Muslim. Id.

Defendant Glenn Lottman is the principal of Woodbridge High School. Id. ¶ 4. Defendant Robert Zega is the Superintendent of Schools for the Woodbridge Township School District. Id. ¶ 5. Plaintiff knew both Lottman and Zega prior to his employment with the Woodbridge Township School District. See id. ¶¶ 9-12, 14. Plaintiff had previously worked as a substitute teacher at a Woodbridge elementary school where Zega worked as the principal. Deposition of Jason Ali, Jan. 9, 2018 ("Ali Dep., Day 1") at 21:12-22:7 (ECF No. 25.6 at 56-57).[2] Zega provided a letter of recommendation in support of Plaintiff's application for employment with the Keansburg School District, where Plaintiff ultimately worked as a tenured high school teacher. Id.

---

[1] Facts derived from the SOMF are undisputed unless otherwise noted. Moreover, where facts in a party's statement are supported by evidence in the record and denied by the opposing party without citation to conflicting evidence, the Court deems such facts undisputed. See Fed. R. Civ. P. 56(e)(2)-(3); Carita v. Mon Cheri Bridals, LLC, 10-2517, 2012 WL 2401985, at *3 (D.N.J. June 25, 2012).

[2] The Court notes that the exhibits contained in Defendants' submission are nearly illegible and directs counsel to screen all future submissions for clarity and legibility.

at 21:12-22:1 (ECF No. 25.6 at 56-57); SOMF ¶ 18. He was employed by Keansburg from 2011 to 2015. Ali Dep., Day 1 at 23:10-18 (ECF No. 25.6 at 58).

After Plaintiff applied for a full-time teaching position at Woodbridge High School, he interviewed with Principal Lottman and History Department Supervisor Matthew Connelly ("Connelly"). SOMF ¶ 15. Superintendent Zega subsequently recommended Plaintiff for hire to the Board of Education. Id. ¶ 17. Plaintiff believes—and Woodbridge acknowledges—that both Lottman and Zega knew Plaintiff was Egyptian before he was hired by the District. Id. ¶ 13; Defs.' Br. at 5 (ECF No. 25.3 at 12).

### 2. Plaintiff's Holocaust Instruction

During Plaintiff's first year of employment at Woodbridge, Connelly received internal complaints about Plaintiff's instruction on the Holocaust. SOMF ¶¶ 21, 24. One English teacher advised Connelly that "her students were questioning historical accounts of the Holocaust, opining that 'Hitler didn't hate the Jews,' [and] that statistics on the death counts were 'exaggerated.'" Id. ¶ 24. The English teacher advised Connelly that the students received this information from Plaintiff. Id.

Discovery revealed that many of Plaintiff's students submitted written assignments embracing theories of Holocaust denial. In a vocabulary assignment, one student wrote: "Adolf Hitler was the leader of Germany. He is looked at as a bad guy but in reality brought Germany out of its great depression." Id. ¶ 29. In an essay, another student expressed the following beliefs:

> I think that what they claim happened in the concentration camps did not really happen. I highly doubt that everyday [sic] Jews were burned. I doubt that they were whipped and beat for nothing at all. What I do believe however is that they had a much easier and more enjoyable life in the camps. Even though they were not at home, they felt like they were.

Id. ¶ 33.  When asked whether this was an "appropriate conclusion" for a student to reach, Plaintiff

answered, "Yes."  Deposition of Jason Ali, Feb. 2, 2018 ("Ali Dep., Day 2") 117:2-13 (ECF No.

25.6 at 308).  Counsel then asked whether it was "okay for 14-year-old girls to think that the camps

were a jolly place and they were better off there than being at home."  Id. at 119:23-25 (ECF No.

25.6 at 308).  Plaintiff responded, "It's appropriate for a 14-year-old girl to do her research on her

own and form opinions."  Id. at 120:6-8 (ECF No. 25.6 at 308).  An excerpt from a class assignment

that a student had submitted to Plaintiff provided:

> Hitler had the plan that saved Germany, which does not make any
> sense as to why everyone still labels him as this monster.  They tell
> you that Hitler invaded countries for no reason.  They will never tell
> you, however, that those countries like Poland that he invaded for
> no reason had been controlling Germany and slaughtering innocent
> Germans.

Id. at 114:9-21 (ECF No. 25.6 at 307).  When asked whether he was "proud that [the student] came

to these conclusions," Plaintiff testified, "Yes, absolutely, because that means she would have

spent a lot of time doing research to come up with these inferences based on the information she

was given."  Id. at 115:9-14 (ECF No. 25.6 at 307).

Another student wrote an essay entitled, "A Gas Chamber Full of Lies" about the film

"Adolf Hitler:  The Greatest Story Never Told."  SOMF ¶ 30.  The student wrote:

> I have been taught that the Holocaust was a time were [sic] Hitler
> chose to brutally abuse, take advantage of, and murder Jews, for
> absolutely no reason at all.  We have all been taught that the
> Holocaust was a time of hate, and that Hitler used the gifts he
> possessed for absolute evil, but is that really the case?  Did the Jews
> not crash Germany's economy on more than one occasion?  Did they
> not criticize Christianity because it was not what they believed?  Did
> the Jewish Zionists themselves not introduce a whole world of
> people to pornography?  Did they not allow even the people of
> youngest ages to take up drugs and alcohol causing addictions that
> led to nothing but they did as they ripped away what they were
> providing the people with in the first place?  Is the death of the Jews
> completely justified?  No, because nobody deserves to die,

regardless what they've done.  But are their deaths really completely unjustified either?

Id. at ¶ 30; id. at Exhibit Q, WBOE 633 (ECF No. 25.6 at 537).  Plaintiff permitted the student author to read that paper aloud in class.  Id. ¶ 31.  When asked whether he "t[aught] [his students] to question the facts as to whether Hitler chose to brutally abuse, take advantage, starve and murder Jews for absolutely no reason at all," Plaintiff responded that he "t[aught] [his] students to question everything."  Ali Dep., Day 2 98:3-8 (ECF No. 25.6 at 303).  When asked whether he "encouraged" his students to "come to different views than the traditional understanding of what World War II and the Holocaust and Hitler were about," Plaintiff responded "Yeah, it's called debate."  Id. at 102:17-103:1 (ECF No. 25.6 at 304).

### 3.  9/11 Lesson Plan

In accordance with instructions from the High School's History Department, Plaintiff prepared and presented a lesson on the terrorist attacks that occurred on September 11, 2001 ("9/11").  SOMF ¶¶ 36-37.  Plaintiff's September 2016 lesson plan directed the students to: "Analyze the abstract of official 9/11 commission.  Analyze the recently released 28 pages of the 9/11 commission report as well as the Saudi Intelligence Report translated by MEMRI.  [Middle Eastern Media Research Institute]."  Id. ¶ 39.[3]  History Department Supervisor Connelly approved the lesson plan and attached a note that read:  "As previously discussed, please be certain to provide

---

[3] In connection with an earlier assignment involving the 9/11 terrorist attacks, one of Plaintiff's students sent Plaintiff an e-mail articulating the following "personal conclusion[s]:"  "that jet fuel does not burn at a high enough temperature to melt steel," Ali Dep., Day 2 at 51:10-15 (ECF No. 25.6 at 291), and that the planning of 9/11 "[h]ad to do with the gathering of government officials and terrorists," id. at 51:18-52:3 (ECF No. 25.6 at 291).  The student's e-mail to Plaintiff expressed her belief that "the story of 9/11 is completely different than the one we've been told."  Id. at 54:12-14.  When asked whether Plaintiff took steps to correct or to clarify the student's understanding of the events that occurred on September 11, 2001, he testified that he did not recall discussing what her feelings were, but, "if [he] would say anything, [he] would say to continue doing research."  Id. at 55:10-56:3 (ECF No. 25.6 at 292).

nonpartisan view of 9/11 with equal weight given to conventional accounts." Id. ¶ 40. In connection with the lesson, Plaintiff also posted links to outside articles from the MEMRI website on a school-sponsored website. Id. ¶ 41. The articles were entitled, "Article in Saudi Daily: U.S. Planned, Carried Out 9/11 Attacks—But Blames Others for Them" and "Egyptian Daily: U.S. Planning 9/11 Style Attack Using ISIS in Early 2015—Like it Did Using Al-Qaeda in 2001." Id. ¶¶ 42-43. The MEMRI articles that were linked to Plaintiff's school webpage contained links to other articles and video clips, including one link that read: "Saudi Scholar Abdailah Al-Yahya: The Jews are Like a Cancer, Woe to the World if they Become Strong." Id. ¶ 45.

On September 28, 2016, a television reporter questioned Plaintiff Lottman about the MEMRI links Plaintiff posted in connection with his September 2016 lesson plan on 9/11. Id. ¶ 46. When the same news station questioned Superintendent Zega about the articles, he advised that "swift action" had been taken to remove the links. Id. ¶ 61. He further indicated that the District would undertake an investigation and that, if warranted based on the outcome of the investigation, "the teacher [would] be disciplined severely." Id. With respect to the links, Zega also opined: "It's upsetting . . . that somebody would do this. It's upsetting that somebody would, especially a teacher, would distribute this message. It is . . . absolutely not something that the District agrees with in any way." Id. ¶ 62.

### 4. Termination of Plaintiff's Employment

On September 28, 2016, Lottman called Plaintiff to his office. Id. ¶ 47. He directed Plaintiff to remove the MEMRI links from the school website. Id. Lottman further instructed Plaintiff to go home for the day and to report to Superintendent Zega's office the following morning. Id. ¶ 48.

The next morning, Defendant Zega questioned Plaintiff about the articles in the presence of Defendant Lottman and History Department Supervisor Connelly.  Id. ¶ 49.   Based on the information obtained at that meeting, Zega made the decision to terminate plaintiff's employment. Zega's decision rested primarily on the MEMRI link that appeared in Plaintiff's lesson plan materials entitled: "Jews are Like a Cancer, Woe to the World if they Become Strong."   See Deposition of Robert Zega, April 18, 2018 ("Zega Dep.") at 63:16-65:3 (ECF No. 25.6 at 351); 66:25-70:3 (ECF No. 25.6 at 352-53); 88:24-90:25 (ECF No. 25.6 at 357-58).   Zega also considered the fact that Plaintiff "never apologized," "never said it was a mistake," and "never said he wouldn't do it again." Id. at 91[4]:19-23 (ECF No. 25.6 at 358).  Zega testified that Plaintiff's responses during the meeting gave him "no reason . . . to believe that if [Plaintiff] went back to the classroom he wouldn't continue to do it." Id. at 65:1-3 (ECF No. 25.6 at 351).  Plaintiff concedes that he did not apologize for posting the links at issue, Ali Dep., Day 1 at 195:8-196:15 (ECF No. 25.6 at 230-31), and has expressed that he had "no reason to apologize" for posting materials that linked to the article entitled "Jews are Like a Cancer," id. at 196:9-15 (ECF No. 256 at 231).[5]  To a lesser extent, Zega also considered the complaints made by other teachers about his students embrace of Holocaust denial, which the students attributed to his classroom instruction.  See Zega Dep. at 79:4-83:15 (ECF No. 25.6 at 355-56).

    Plaintiff was given a letter at the end of the meeting, which advised that his employment was terminated effective that day—September 29, 2016.[6] Id. ¶¶ 51, 58.  The Board of Education

---

[4] Page 91 is mislabeled in the deposition transcript as page 92.

[5] Plaintiff's account of the meeting was also consistent with Zega's insofar as he testified that he attempted to explain the legitimacy of the articles he posted on the school's website.  Id. at 198:20-199:13 (ECF No. 25.6 at 234).

[6] Plaintiff's termination letter states:

> As a summary of this morning's meeting between you, the Principal
> of Woodbridge High School, Glenn Lottman, and the Vice Principal

approved Plaintiff's termination at its next meeting.  Id. ¶ 69.  On October 28, 2016, the District's Employee Benefits Insurance Specialist mailed a letter to Plaintiff's home address, which indicated that Plaintiff's health benefits had been extended through November 30, 2016 and provided information relating to Plaintiff's right to COBRA continuation coverage.  Id. ¶ 70.  Plaintiff claims that he never received the letter.  Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("RSOMF") ¶ 70.

### 5.  Alleged Discriminatory Remarks

Plaintiff alleges that Defendant Lottman made disparaging comments about Plaintiff's ethnicity throughout the duration of his employment with Woodbridge.  Plaintiff alleges that Lottman referred to Plaintiff as "Mufasa" or "Mufasa Ali" on multiple occasions, which Plaintiff believes to be a satirical reference to his middle name, Mostafa, and to a character from the Lion King.  SOMF ¶ 63.  Plaintiff also alleges that Lottman once asked "whether they had computers in Egypt" when Plaintiff was having a problem with the technology in his classroom, id. ¶ 64, and that he greeted Plaintiff on two occasions by saying, "Hey Arabia Nights," Ali Dep., Day 1 at 88:5-8 (ECF No. 25.6 at 123), and "Hey, Big Egypt," id. at 94:7-14 (ECF No. 25.6 at 129).  Plaintiff further alleges that he heard rumors about other teachers characterizing him as "anti-Semitic," "unpatriotic," and a "conspiracy theorist."  Id. at 124:11-16 (ECF No. 25.6 at 159); 133:15-134:4 (ECF No. 25.6 at 168-69)

---

of Woodbridge High School, Matthew Connelly, and myself, certain allegations of a serious nature have been made against you and ultimately corroborated.  Therefore, you are hereby terminated from your position as a teacher for the Woodbridge Township School District, effective today, Thursday, September 29, 2016.

Termination letter (ECF No. 25.6 at 366).

. Plaintiff also claims that school officials made disparaging comments about his ethnicity during the meetings that occurred on September 28 and 29 of 2016, the date of Plaintiff's termination and the day before. He alleges that, when addressing the MEMRI articles, Defendant Lottman said, "Figures, the Arab." Id. at 175:21-24 (ECF No. 25.6 at 210). Plaintiff further claims that Defendant Zega asked Plaintiff if he could "see how someone with [his] Arab . . . and . . . Muslim [background] who puts up [these] links on a [school-sponsored website] can be considered offensive." Id. at 197:2-6 (ECF No. 25.6 at 232). Plaintiff alleges that Zega also asked Plaintiff if he was "harboring terrorism" in his classroom, id. at 197:14-17 (ECF No. 25.6 at 232), and told Plaintiff that the District does not need a "Middle Eastern perspective," id. at 204:4-8 (ECF No. 25.6 at 239). Defendants deny that they made these statements.

## B. Procedural History

On March 13, 2017, Plaintiff filed a fifteen-count Complaint against Defendants in New Jersey Superior Court. Complaint (ECF No. 1.1). Plaintiff's Complaint alleged violations of: (1) the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, et seq., ("NJLAD") on the basis of race, id. ¶¶ 64-69; (2) NJLAD on the basis of religion and creed, id. ¶¶ 70-75; (3) NJLAD on the basis of perceived religion, id. ¶¶ 76-81; (4) NJLAD on the basis of aiding and abetting other violations of NJLAD, id. ¶¶ 82-86; (5) NJLAD on the basis of creating a hostile work environment, id. ¶¶ 87-90; (6) Plaintiff's Weingarten rights, NLRB v. Weingarten, 420 U.S. 251 (1975), id. ¶¶ 91-94; (7) the New Jersey Open Public Meetings Act, N.J.S.A. § 10:4-6, et seq. ("OPMA"), id. ¶¶ 95-99; (8) common law defamation, id. ¶¶ 100-107; (9) common law libel, id. ¶¶ 108-113; (10) common law false light and invasion of privacy, id. ¶¶ 114-121; (11) 42 U.S.C. § 1983 for defamatory statements made in violation of the Fourteenth Amendment of the U.S. Constitution, id. ¶¶ 122-131; (12) 42 U.S.C. § 1983 for retaliation in violation of Plaintiff's Right to Freedom

of Speech pursuant to the First Amendment of the U.S. Constitution, id. ¶¶ 132-140; (13) 42 U.S.C. § 1983 for retaliation in violation of Plaintiff's Right to Academic Freedom pursuant to the First Amendment of the U.S. Constitution, id. ¶¶141-149; (14) 42 U.S.C. § 1981 for discrimination on the basis of Plaintiff's race, id. ¶¶ 150-157; (15) the Consolidated Omnibus Budget Reconciliation Act, 19 U.S.C. § 1161, et seq. ("COBRA"), id. ¶¶ 158-162.

On April 3, 2017, Defendants removed the action to federal court. ECF No. 1. Defendants subsequently moved to dismiss Counts Six and Fifteen of Plaintiff's Complaint. ECF No. 3. This Court granted Defendants' Motion as to Count Six, and denied the Motion as to Count Fifteen. ECF No. 11. Currently pending before the Court is Defendants' Motion for Summary Judgment as to all remaining claims. ECF No. 25.

## II.    LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

III.  **ANALYSIS**

   A.  **Discrimination Claims**

      1.  **NJLAD (Counts One, Two, and Three) and 42 U.S.C. § 1981 (Count Fourteen)**

Plaintiff argues that Defendants violated the NJLAD and/or 42 U.S.C. § 1981 by terminating his employment on the basis of his race, religion, or perceived religion.  Defendants submit that they are entitled to summary judgment on these claims because Plaintiff fails to establish that Defendants' legitimate, non-discriminatory reasons for the District's employment decision were pretextual.  The Court agrees.

The NJLAD prohibits employers from discriminating against their employees on the basis of race, creed, color, and national origin, among other things.  N.J.S.A. § 10:5-12(a).  42 U.S.C. § 1981 likewise prohibits employment discrimination on the basis of "race, ancestry, and ethnic characteristics."  Wesley v. Palace Rehab. & Care Ctr., L.L.C., 3 F. Supp. 3d 221, 228 (D.N.J. 2014) (internal quotation marks omitted).  Claims asserted under both the NJLAD and 42 U.S.C. § 1981 are subject to the McDonnell Douglas burden-shifting framework.  See Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 546 (2013) ("All [NJLAD] claims are evaluated in accordance with the United State Supreme Court's burden-shifting mechanism.") (citing McDonnell Douglas Corp. v. Green, 411 U.S. 793 (1973)); accord Wesley, 3. F. Supp. 3d at 230-31 ("Claims brought under § 1981 and the NJLAD are analyzed using the same evidentiary schemes.").  Under this framework, a plaintiff must first establish a prima facie case of unlawful action by the employer, McDonnell Douglas, 411 U.S. at 802, by establishing:  (1) that he is a member of a protected class; (2) that he was qualified for the position in question; (3) that he suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination.  Houston v. Dialysis Clinic, Inc., 13-4461, 2015 WL 3935104 (D.N.J. June 26,

2015) (addressing prima facie elements of race discrimination claims under NJLAD and § 1981); see Tisby v. Camden Cty. Corr. Facility, 448 N.J. Super. 241, 248 (App. Div. 2017) (addressing prima facie elements of religious discrimination claim under the NJLAD).

If the plaintiff meets this initial burden, the burden shifts to the defendant, who must articulate legitimate, non-discriminatory reasons for its employment decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 526 (1993); Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008). Once the employer meets its burden of articulating a legitimate, non-discriminatory reason, the burden again shifts to the employee to present evidence from which a factfinder could infer that the proffered reasons were pretextual. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

Assuming Plaintiff can establish a prima facie case,[7] the Court turns to the second inquiry of the McDonnell Douglas burden-shifting framework: whether Defendants have articulated a legitimate, non-discriminatory reason for the termination of Plaintiff's employment. The Court finds that they have. Plaintiff was terminated on the immediate heels of his posting links on a school-sponsored webpage which contained content that was disparaging and hateful toward members of the Jewish faith. One article Plaintiff posted contained a link entitled, "The Jews are Like a Cancer, Woe to the World if they Become Strong." Although the anti-Semitic article was not directly linked to Plaintiff's school-sponsored webpage, it was visible and accessible through the materials Plaintiff provided to his students. To make matters worse, when confronted at the September 29, 2016 meeting, Plaintiff did not apologize, but instead attempted to defend the legitimacy of the source. Zega concluded that he could not return Plaintiff to a classroom with

---

[7] Although Defendants dispute whether Plaintiff has established a prima facie case, the Court will assume satisfaction of all four elements for the purpose of this Motion.

confidence that the conduct would not be repeated. These were serious, corroborated allegations which required termination. The Court is satisfied that Defendants have presented a legitimate, non-discriminatory reason for Plaintiff's termination.

To withstand summary judgment, Plaintiff must demonstrate pretext by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Defendants'] . . . articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the . . . action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); see also St. Mary's Honor Ctr., 509 U.S. at 519 ("It is not enough . . . to dis believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."). A plaintiff bears the burden of proving pretext by a preponderance of the evidence. Wesley, 3 F. Sup. 3d at 231. Here, Plaintiff submits that "Defendants['] . . . various and contradictory reasons" for Plaintiff's termination support the conclusion that their proffered reasons were pretext for discrimination. Pl.'s Br. at 14 (ECF No. 28 at 21). Plaintiff argues that Defendants' refusal to consider his explanation, or to conduct their own research, about the qualifications and legitimacy of the MEMRI organization further supports that the reasons proffered for Plaintiff's termination were pretextual. Id. at 15 (ECF No. 28 at 22). The Court disagrees.

Plaintiff has failed to point to any evidence upon which to disbelieve Defendants' articulated reason. The reason is consistent and clear. Plaintiff provided students access to a repugnant, hateful, and inflammatory resource, without any sense of regret or apology. This is a legitimate ground for termination. The law does not require the school board to "conduct their own research" about such an offensively-titled link before doing so. And Zega's decision to terminate based on his concern that Plaintiff might repeat his error was reasonable and legitimate,

especially given previous complaints by other teachers. These were serious concerns about students advancing theories of Holocaust denial based on what they learned in Plaintiff's classroom—a point plaintiff did not deny later in discovery. And although Plaintiff points to disparaging comments made by Lottman and Zega, these comments are insufficient to demonstrate that discrimination was a motivating cause for his termination when viewed against the fact that both Lottman and Zega were aware of his national origin and religious affiliation before hiring him just one year earlier.

In sum, the Court finds that Defendants' proffered reasons—dissemination, through official school channels, of materials containing links to anti-Semitic media, coupled with an undisputed lack of remorse for same conduct[8], and a history of allowing holocaust denial theories to permeate his classroom—are legitimate, non-discriminatory reasons supporting the District's adverse employment decision. Plaintiff fails to cast doubt on those reasons. Thus, Plaintiff has not presented any evidence that could persuade a reasonable jury that Defendants' rationale was merely pretext and that racial or religious discrimination more likely than not played a role in the District's employment decision. Accordingly, Defendants are entitled to summary judgment as to Counts One, Two, Three, and Fourteen.

---

[8] Plaintiff argues, in part, that summary judgment is inappropriate because he disputes certain facts underlying the District's termination decision, i.e., whether Connelly had previously warned Plaintiff about "teaching an unconventional view of 'sensitive content.'" See SOMF ¶ 25; RSOMF ¶ 25; Pl.'s Br. at 17 (ECF No. 28 at 24). However, the District's primary reasons for terminating Plaintiff's employment—the action of posting links that contained anti-Semitic references and Plaintiff's response when confronted with that allegation—are undisputed, as noted above. The Court finds these reasons sufficient to defeat Plaintiff's discrimination claim, and accordingly deems any factual disputes concerning ancillary reasons for the District's termination decision to be immaterial.

## 2. NJLAD—Hostile Work Environment (Count Five)

Plaintiff contends that Defendants also violated the NJLAD by subjecting him to a hostile work environment. Defendants maintain that they are entitled to summary judgment on this claim because Plaintiff has failed to establish that he was subjected to pervasive harassment due to his race, religion, or perceived religion. The Court agrees.

To establish a hostile work environment claim, the plaintiff must show that: (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013); see also Sgro v. Bloomberg L.P., 331 F. App'x 932, 941 (3d Cir. 2009) ("New Jersey courts treat hostile work environment claims under the NJLAD the same as the Supreme Court treats hostile work environment claims under Title VII."). In determining whether a work environment is hostile, courts must "consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Mandel, 706 F.3d at 168 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Significantly, "offhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (internal quotation marks omitted).

Here, Plaintiff alleges that comments made by Lottman while Plaintiff was employed by Woodbridge created a hostile work environment. In support of his claim, Plaintiff alleges that

Lottman made the following five[9] remarks prior to the events surrounding Plaintiff's termination. Pl.'s Br. at 25 (ECF No. 18 at 32). On one occasion, Lottman greeted Plaintiff by saying, "Hey, Arabia Nights." Ali Dep., Day 1 at 87:12-88:8 (ECF No. 25.6 at 122-23). One another single occasion, Lottman greeted Plaintiff by saying, "Hey, Big Egypt." Id. at 94:7-24 (ECF No. 25.6 at 129). During an in-class evaluation, Lottman once asked Plaintiff whether they "have computers in Egypt" when Plaintiff was experiencing technological difficulty in his classroom. Id. at 97:8-22 (ECF No. 25.6 at 132). When another teacher watched Plaintiff's students while he used the restroom, Lottman told that teacher, "you can't trust anybody with the last name Ali these days." Deposition of Patricia Pascucci, December 12, 2017 ("Pascucci Dep.) at 38:9-25 (ECF No. 28.11 at 12). Lottman "often times" referred to Plaintiff as "Mufasa" or "Mufasa Ali." Ali Dep., Day 1 at 88:20-89:2 (ECF No. 25.6 at 123-24). All of these alleged remarks, with the exception of Lottman referring to Plaintiff as "Mufasa," are alleged to have been isolated occurrences. Plaintiff never complained to his superiors or to any union representative about these comments. SOMF ¶ 67. When asked at his deposition why he did not complain, he responded, "I'm a big boy. As long as I'm getting my paycheck every two weeks, I could deal with words." Id. ¶ 68.

Plaintiff also alleges that Lottman and Zega's comments during the meetings that precipitated his termination created a hostile work environment. Plaintiff alleges that Lottman said, "Figures, the Arab," after reading the words "Middle East" from the MEMRI website. Ali Dep., Day 1 at 175:21-24 (ECF No. 25.6 at 210). He alleges that Zega made the following discriminatory comments during their September 29, 2016 meeting. Pl.'s Br. at 25 (ECF No. 28

---

[9] Plaintiff also alleges that Lottman "would say," "look out for the Egyptian," but does not specify whether this occurred on more than one occasion. Compl. ¶ 13 (ECF No. 1.1 at 11). Plaintiff fails to cite any underlying evidence to substantiate this claim, citing only to his Complaint. Because discovery has concluded and has apparently failed to produce any evidence to support this allegation, the Court will not consider it.

at 32). Zega called Plaintiff anti-Semitic. Ali Dep., Day 1 at 190:7-9 (ECF No. 25.6 at 225). He asked Plaintiff whether he was "harboring terrorism" in his classroom. Id. at 197:14-17 (ECF No. 25.6 at 232). He told Plaintiff, "we don't want your kind in this district." Id. at 209:15-19 (ECF No. 25.6 at 244). Zega called Plaintiff "an obvious racist, bigoted conspiracy theorist." Id. at 210:9-10 (ECF No. 25.6 at 245).

Based on the allegations summarized above, no reasonable factfinder could conclude that the alleged discrimination was severe, pervasive, or regular. Plaintiff points to just five remarks over the course of an entire year to support the conclusion that he was subjected to a hostile work environment. While Lottman's comments are inappropriate if true, they fail to rise to the level necessary to establish a hostile work environment. Because Plaintiff alleges only a few isolated remarks rather than a pattern of discriminatory comments, he must demonstrate that the remarks were "extremely derogatory." See Nuness v. Simon & Schuster, Inc., 325 F. Supp. 3d 535, 550 (D.N.J. 2018) (internal quotation marks omitted). Plaintiff has failed to do so.

None of Lottman's comments were physically threatening. Lottman's greetings, "Hey, Big Egypt" and "Hey, Arabia Nights," his inquiry about whether they "had computers in Egypt," and his comment that "you can't trust anyone with the last name Ali these days," while inappropriate, do not rise to the level of unreasonably interfering with an employee's work environment. Cf. Ahmed v. Interstate Mgmt. Co., 11-683, 2012 WL 3038523, at *17 (D.N.J. July 25, 2012) (finding co-workers' use of ethnic epithets, including references to Plaintiff as "Indian," "terrorist," and "Arab," while certainly "offensive and inappropriate," did not form basis for hostile work environment where plaintiff did not report the conduct). Finally, Lottman's alleged reference to Plaintiff's middle name, Mostafa, as "Mufasa," although inappropriate and unprofessional, does not appear to be related to Plaintiff's racial or religious identity. Viewed

together, the Court finds the frequency and severity of the conduct alleged to be relatively minimal. Compare Streater v. City of Camden Fire Dept., 567 F. Supp. 2d 667, 674 (D.N.J. 2008) (finding sufficient evidence of pervasiveness where defendants "regularly made jokes with racial themes" and "threatening comments with offensive racial content") and Nuness, 325 F. Supp. 3d at 546-550 (concluding reasonable factfinder could find hostile work environment where "abusive co-worker called [Plaintiff] a contraction of the N-word and pig") with McKinnon v. Gonzales, 642 F. Supp. 2d 410, 423 (D.N.J. 2009) (finding "the brief collection of unfriendly comments" insufficient to rise to the level of pervasive hostility). Moreover, the fact that Plaintiff never reported the comments to a union representative or a member of the District's administration supports the conclusion that the remarks did not unreasonably interfere with his work performance.

The same analysis applies to the remarks Lottman and Zega made during the meetings leading up to Plaintiff's termination. Zega's alleged statements characterizing Plaintiff as "anti-Semitic" and "an obvious racist, bigoted conspiracy theorist" are general insults that do not directly relate to Plaintiff's racial or religious identity. Plaintiff alleges that Lottman and Zega made disparaging comments at the termination meeting when discussing Plaintiff's decision to include articles containing repugnant anti-Semitic content on his school webpage. The alleged comments—"Figures, the Arab," "we don't want your kind in this district," and Zega's inquiry about whether Plaintiff was "harboring terrorism" in his classroom—while inappropriate, do not rise to the level of creating a hostile work environment for the reasons articulated above. None of the comments are physically threatening or had the potential to unreasonably interfere with Plaintiff's work performance.

Accordingly, no reasonably jury could conclude that Plaintiff was the victim of a hostile work environment. Defendants' Motion for Summary Judgment is granted as to Count Five.

### 3. NJLAD—Aiding and Abetting (Count Four)

The NJLAD imposes liability upon individual defendants who aid and abet an employer's NJLAD violations. N.J.S.A. § 10:5-12(e). An employee may be held liable for aiding and abetting under the NJLAD if a plaintiff establishes the following elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." Taylor v. Lincare, Inc., 15-6284, 2016 WL 3849852, at *7 (D.N.J. July 15, 2016) (internal quotation marks omitted). A violation of the NJLAD on the basis of aiding and abetting must be predicated on an underlying NJLAD violation. See id. at 21-22 ("Therefore, because Plaintiff's underlying causes of action fail, there can be no claim for aiding and abetting in violation of the NJLAD.") (internal quotation marks omitted). Because the Court has granted summary judgment as to all other NJLAD Counts, Defendants are likewise entitled to summary judgment as to Count Four.

### B. Defamatory Statements

Plaintiff claims that Zega made statements to the press that defamed Plaintiff. Defendants submit that they are entitled to summary judgment on Plaintiff's defamation claims because the statements are non-defamatory as a matter of law. The Court agrees.

On September 28, 2016, Defendant Zega was interviewed by a television news station. Zega made the following statements, which Plaintiff claims are "false and defamatory." Pl.'s Br. at 30 (ECF No. 28 at 37). In reference to the MEMRI articles, Zega stated: "It's upsetting . . . that somebody would do this. It's upsetting that somebody would, especially a teacher, would distribute this message. It is . . . absolutely not something that the District agrees with in any way."

SOMF ¶ 62.  Zega also stated that the District took "swift action" to remove the links and that the

teacher would be "disciplined severely," if warranted, following an investigation.  Id. ¶ 61.  At the

end of the news report, Zega was asked whether there is "any excuse for something like this."

Zega responded, "No. No, there is not."  Video Recording, Exhibit J to ECF No. 25.

> **1.  State Law Claims—Defamation (Count Eight); Libel (Count Nine); and False Light/Invasion of Privacy (Count Ten)**

To establish defamation under New Jersey law, a plaintiff must demonstrate that the

defendant: (1) made a false and defamatory statement concerning the plaintiff; (2) communicated

the statement to a third party; and (3) had a sufficient degree of fault.  Cruz v. HSBC, 10-135, 2010

WL 2989987, at *2 (D.N.J. July 26, 2010).  A defamatory statement "is one that subjects an

individual to contempt or ridicule, one that harms a person's reputation by lowering the

community's estimation of him or by deterring others from wanting to associate or deal with him."

Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 253 (2018).  Courts consider a

challenged statement's content, verifiability, and context in determining whether it has a

defamatory meaning.  Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585 (2009).  As part of that

inquiry, statements of opinion are not defamatory.  DeAngelis v. Hill, 180 N.J. 1, 14 (2004).  New

Jersey's defamation law "generally does not distinguish between actionable conduct in print or

electronic form."  Petro-Lubricant, 233 N.J. at 252; see W.J.A. v. D.A., 210 N.J. 229, 238-39

(2012) ("A defamatory statement may consist of libel or slander.")

Here, Plaintiff points to three statements he alleges to be defamatory.  First, Zega's

statement that "[i]t's upsetting that somebody would . . . distribute this message" and that the

disseminated materials are "not something that the District agrees with in any way" are matters of

opinion.  They are not actionable false statements of fact.  Second, Zega's statement that there is

"no excuse" for posting the MEMRI articles likewise expresses a non-actionable opinion.  See

Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 168 (1999) ("If a statement could be construed as either fact or opinion, a Defendant should not be held liable."). Finally, Zega's statement that the District took "swift action" to remove the links and that "the teacher [would] be disciplined severely" if warranted following an investigation are non-defamatory because they are not false. Plaintiff does not argue otherwise.

In order to state a claim for False Light under New Jersey law, a plaintiff must demonstrate that: (1) "the false light in which the other was placed would be highly offensive to a reasonable person"; and (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." DeAngelis, 180 N.J. at 19. Plaintiff is unable to state a claim for false light for the same reasons expressed above. See Edelman v. Croonquish, 09-1938, 2010 WL 1816180, at *7 (D.N.J. May 4, 2010) ("The tort of false light requires 'that the published material contain a false portrayal . . . . Opinion statements . . . are generally not capable of proof of truth or falsity."); Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 425 (D.N.J. 2005) ("[O]pinions cannot form the basis of a claim for false light or defamation.").

Accordingly, Defendants are entitled to summary judgment on Counts Eight, Nine, and Ten.

### 2. 42 U.S.C. § 1983—Defamation (Count Eleven)

Plaintiff argues that Zega's allegedly defamatory statements deprived him of his "liberty interest in his reputation." Pl.'s Br. at 33 (ECF No. 28 at 40). In order to prevail on a claim under § 1983, a plaintiff must prove that "his constitutional rights were violated by someone acting under color of state law." See Rodriguez v. Fajardo, 06-4996, 2007 WL 1959254, at *7 (D.N.J. July 3, 2007). Courts in this district have recognized that it is "well-settled that 'reputation alone is not

an interest protected by the Due Process Clause,' and that 'defamation is actionable under 42 U.S.C. § 1983 only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution.'" Stolinski v. Pennypacker, 07-3174, 2008 WL 5136945, at *11 (D.N.J. Dec. 4, 2008) (quoting Clark v. Twp. of Falls, 890 F.2d 611, 619 (3d Cir. 1989)). As a result, the Third Circuit has rejected "claims for simple defamation under § 1983." See Rivera v. Zweigle, Civ. No. 13-3024, 2014 U.S. Dist. LEXIS 170580, at *13-14 n.3 (D.N.J. Dec. 9, 2014).

Here, Plaintiff alleges that "Defendant Zega created and disseminated a false and defamatory impression about Plaintiff in connection with his termination, thus, depriving Plaintiff of a protected liberty interest in his reputation." Compl. ¶ 126 (ECF No. 1.1). Alleging a "claim for simple defamation" and loss of nothing more than the liberty interest in his reputation, Plaintiff's claim falls squarely into the type of case prohibited by the case law in this district. The Court grants Defendants' Motion for Summary Judgment as to Count Eleven.

### C. First Amendment Claims (Counts Twelve and Thirteen)

Plaintiff alleges that Defendants violated his rights to free speech and academic freedom rights under the First Amendment of the United States Constitution. Defendants submit that they are entitled to summary judgment on these claims because Plaintiff has failed to demonstrate that the speech at issue was protected. The Court agrees.

In order to establish a First Amendment retaliation claim, a public employee must demonstrate that: (1) "his [activity] is protected by the First Amendment"; and (2) "the [activity] was a substantial or motivating factor in the alleged retaliatory action." Falco v. Zimmer, 17-3396, 2019 WL 1569564, at *6 (3d Cir. Apr. 11, 2019). Speech must involve "a matter of public concern" to qualify as protected speech. Hashem v. Hunterdon County, 15-8585, 2016 WL

5539590, at *19 (D.N.J. Sept. 29, 2016). Matters of public concern arise from speech that relates to "political, social, or other concerns to the community." Id. (quoting Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001)). The Third Circuit has consistently held that there are "recognized limitations upon free speech" in the educational setting. Brown v. Armenti, 247 F.3d 69, 74 (3d Cir. 2001); see Edwards v. Cal. Univ. of Penn., 156 F.3d 488, 491 (3d Cir. 1998) ("[A] public university professor does not have a First Amendment right to decide what will be taught in the classroom."). A teacher's in-class conduct is not protected speech. Id. (delineating "in the classroom" conduct as that which falls into the category of "[t]he four essential freedoms that constitute academic freedom[, which] have been described as a university's freedom to choose who may teach, what may be taught, how it shall be taught, and who may be admitted to study"); Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1176 (3d Cir. 1990) (citing Clark v. Holmes, 474 F.2d 928 (7th Cir. 1972), in which the Seventh Circuit issued a per curiam opinion upholding a school district's decision to terminate a teacher whose biology classes contained too much discussion of sex).

In Plaintiff's free speech claim, he alleges that he "engaged in activity protected by the First Amendment when he posted, on the school's public portal, alternative views on the cause of the September 11, 2001 attacks." Compl. ¶ 135. Plaintiff asserts identical allegations in support of his academic freedom claim. However, the District, not Plaintiff, has the ultimate right to decide what will be taught in the classroom. See Brown, 247 F.3d at 74; Edwards, 156 F.3d at 491 (finding no right to use certain educational materials in the classroom). Accordingly, Plaintiff has failed to demonstrate that posting the MEMRI links on the school-sponsored website constitutes protected speech. Defendants are entitled to summary judgment on Counts Twelve and Thirteen.

### D. Consolidated Omnibus Budget Reconciliation Act

In Count Fifteen, Plaintiff alleges that Defendants violated COBRA by failing to "provide Plaintiff with the COBRA Election Notice notifying him of the COBRA Health Benefits Program." Compl. ¶ 160. Defendants submit that they are entitled to summary judgment because they sent a notice to Plaintiff's last known address. The Court agrees.

COBRA provides that an employer's plan administrator must provide notice to employees of their COBRA rights upon the occurrence of a qualifying event, such as termination of employment. 29 U.S.C. § 1166(a). Courts in this district have ruled that mailing a notice to an employee's last known address constitutes a good faith attempt at COBRA compliance. McGoldrick v. TruePosition, Inc., 623 F. Supp. 2d 619, 633 (D.N.J. 2009) (noting COBRA Congressional Congress Committee's expressed intention that "notice by mail to the qualified beneficiary's last known address to be adequate"); Vanderhoof v. Life Extension Inst., 988 F. Supp. 507, 518 (D.N.J. 1997) (same). The employer is not required to prove that the notice was received. McGoldrick, 623 F. Supp. 2d at 633.

Here, Plaintiff argues that Defendants violated COBRA because he never received a notice. However, Defendants submitted a Certification from the District's benefits and insurance specialist indicating that she mailed a letter advising Plaintiff of his rights under COBRA on October 28, 2016. Certification of Nancy Alberici ¶ 2 (ECF No. 25.6 at 599). She certified that she sent the letter via regular mail to the home address maintained on file. Id. ¶ 3. The letter, dated October 28, 2016, is attached to the Certification. ECF No. 25.6 at 602. Defendants have met their burden of demonstrating a good faith effort to notify Plaintiff of his rights in accordance with COBRA. The Court grants summary judgment as to Count Fifteen.

### E. Open Public Meetings Act

The Court has granted summary judgment as to all Federal claims in the instant matter. The remaining claim alleges violation of the OPMA on the basis of the District's failure to provide Plaintiff with a <u>Rice</u> notice prior to the Board of Education meeting at which the Board voted to terminate Plaintiff's employment. In the interests of judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over the sole surviving state law claim. <u>See</u> <u>Bringa v. Roque</u>, 13-3296, 2015 WL 857884, at *5 (D.N.J. Feb. 27, 2015) ("Section 1367 provides that 'district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.'"). Defendants' Motion for Summary Judgment is denied as to Count Seven. Count Seven is remanded to the New Jersey Superior Court.

### IV.    CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment, ECF No. 25, is **GRANTED IN PART** and **DENIED IN PART**. Count Seven is hereby **REMANDED** to the New Jersey Superior Court. The remaining claims are **DISMISSED** and the case is **CLOSED**.

Dated: April 30, 2019

*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**
